**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

HANNAH LEIGH J.,[1]          ) Case No. CV 19-8183-JPR
                            )
                Plaintiff,  )
                            )
          v.                ) **MEMORANDUM DECISION AND ORDER**
                            ) **AFFIRMING COMMISSIONER**
ANDREW SAUL, Commissioner   )
of Social Security,         )
                            )
                Defendant.  )
_____)

**I.   PROCEEDINGS**

    Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security supplemental security income benefits ("SSI").  The matter is before the Court on the parties' Joint Stipulation, filed August 31, 2020, which the Court has taken under submission without oral argument.  For the reasons discussed below, the Commissioner's decision is affirmed.

_____

    [1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

**II.   BACKGROUND**

Plaintiff was born in 1997.  (Administrative Record ("AR") 161.)  She completed high school and worked part time as a baker, receptionist, and warehouse worker, although her most recent jobs were in customer service.  (AR 34, 175-76, 190.)  On November 12, 2015, she applied for SSI, alleging that she had been unable to work since February 15 of that year because of major depression, chronic post-traumatic stress disorder, borderline personality disorder, and generalized anxiety.  (AR 15, 189.)  After her application was denied (AR 74-78), she requested a hearing before an Administrative Law Judge (AR 85-90).  One was held on April 17, 2018, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (See AR 28-55.)  In a written decision issued July 25, 2018, the ALJ found her not disabled.  (AR 15-23.)  She sought Appeals Council review (AR 158, 227-29), which was denied on July 18, 2019 (AR 1-6).  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is "more than a mere scintilla, but less than a preponderance."

2

1   *Lingenfelter*, 504 F.3d at 1035 (citing *Robbins v. Soc. Sec.*

2   *Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). "[W]hatever the

3   meaning of 'substantial' in other contexts, the threshold for

4   such evidentiary sufficiency is not high." *Biestek v. Berryhill*,

5   139 S. Ct. 1148, 1154 (2019). To determine whether substantial

6   evidence supports a finding, the reviewing court "must review the

7   administrative record as a whole, weighing both the evidence that

8   supports and the evidence that detracts from the Commissioner's

9   conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir.

10  1998). "If the evidence can reasonably support either affirming

11  or reversing," the reviewing court "may not substitute its

12  judgment" for the Commissioner's. *Id.* at 720-21.

13  **IV.  THE EVALUATION OF DISABILITY**

14      People are "disabled" for Social Security purposes if they

15  are unable to engage in any substantial gainful activity owing to

16  a physical or mental impairment that is expected to result in

17  death or has lasted, or is expected to last, for a continuous

18  period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Drouin*

19  *v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

20      A.   The Five-Step Evaluation Process

21      An ALJ follows a five-step sequential evaluation process to

22  assess whether someone is disabled. 20 C.F.R. § 416.920(a)(4);

23  *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as

24  amended Apr. 9, 1996). In the first step, the Commissioner must

25  determine whether the claimant is currently engaged in

26  substantial gainful activity; if so, the claimant is not disabled

27  and the claim must be denied. § 416.920(a)(4)(i).

28      If the claimant is not engaged in substantial gainful

activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 416.920(a)(4)(ii) & (c).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 416.920(a)(4)(iii) & (d).  If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, she is not disabled and the claim must be denied.  § 416.920(a)(4)(iv).  The claimant has the burden of proving she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner bears the burden of establishing that the

_____

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 416.945(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  The Commissioner assesses the claimant's RFC between steps three and four.  Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

1 claimant is not disabled because she can perform other

2 substantial gainful work available in the national economy, the

3 fifth and final step of the sequential analysis.

4 § 416.920(a)(4)(v), 416.960(b).

5      B.   <u>The ALJ's Application of the Five-Step Process</u>

6      At step one, the ALJ found that Plaintiff had not engaged in

7 substantial gainful activity since November 12, 2015, the

8 application date. (AR 17.) At step two, he determined that she

9 had severe impairments of anxiety, depression, and personality

10 disorder.[3] (<u>Id.</u>)

11      At step three, he found that Plaintiff's impairments did not

12 meet or equal any of the impairments in the Listing. (AR 18.)

13 At step four, he determined that she had the RFC to perform a

14 full range of work at all exertional levels with the following

15 nonexertional limitations: "no more than simple, routine,

16 repetitive tasks; no more than incidental contact with

17 supervisors; no more than occasional and superficial contact with

18 coworkers; and no contact with the public." (AR 18.)

19      The ALJ found that Plaintiff had no past relevant work (AR

20 22), but she could work as a cleaner II, scrap sorter, or machine

21

22      [3] The ALJ did not include PTSD as a severe impairment

23 despite several doctors' diagnosis of it but included a
discussion of her symptoms and treatment for it in the medical

24 summary. (<u>See</u> AR 17, 19-22.) And as explained in section
V.A.4.a., he reasonably accommodated those symptoms by limiting

25 Plaintiff's contact with supervisors, coworkers, and the public.
Therefore, any error was harmless. <u>See</u> <u>Lewis v. Astrue</u>, 498 F.3d

26 909, 911 (9th Cir. 2007) (failure to address particular

27 impairment at step two harmless if ALJ fully evaluated claimant's
medical condition in later steps of sequential evaluation

28 process).

feeder, positions that "exist[ed] in significant numbers in the national economy" (AR 22-23).  Accordingly, he found her not disabled.  (AR 23.)

**V.   DISCUSSION**

Plaintiff alleges that the ALJ erred in evaluating the medical evidence and opinions, assessing her symptom statements, and determining her RFC.  (See J. Stip. at 3-17, 21-31, 35-39, 40-41.)  For the reasons discussed below, remand is not warranted.

A.   The ALJ Properly Evaluated the Medical Opinions and Evidence

1.   Relevant background

a.   *Samuel Byungsung Lee*

On February 12, 2015, Plaintiff reported to psychiatrist Samuel Byungsung Lee that she had been having nightmares about her father, who she alleged had physically abused her, for approximately four weeks.  (AR 239.)   The nightmares started when she was four years old, soon after the abuse allegedly began.  (Id.)  She started experiencing social anxiety, not wanting to go to school, and becoming "scared of things such as jackets" or "anything out of place."  (Id.)  Recently, she "ha[d] been feeling that certain objects may be moving throughout the house, which ma[de] her feel scared."  (Id.)  She reported feeling when in public "that someone [wa]s going to shoot her." (Id.)  She was scared at restaurants and would hide in the restroom or leave early.  (Id.)  "She constantly look[ed] around at people because she believe[d] they might hurt her, especially men."  (AR 239-40.)  She also reported "feeling depressed for the

6

past month," isolating socially, losing her energy, missing school a lot, losing her appetite, and becoming emotionally unresponsive.  (AR 240.)  She had "passive suicidal thoughts" as recently as the previous night; had deleted all social media and put her phone into airplane mode because she "d[idn't] want to look at anybody"; and "[f]elt hopeless, stuck," and like there was "nothing" she could do to "feel better."  (Id.)  She reported a history of cutting, stating that she "[did] it when [she was] angry" and had last done it three months prior.  (Id.)  She "cut[] not to hurt [her]self, but to feel something because she's angry."  (Id.)  She denied any "active suicidal ideation, intent or plan."  (Id.)  She reported that her anxiety came "in waves" and that several situations, especially movie theaters, triggered severe panic attacks, with shortness of breath, sweating, and palpitations.  (Id.)  But at the time of the examination, she denied symptoms of PTSD, obsessive compulsive disorder, social anxiety, any specific phobia, or a history of manic symptoms. (Id.)  Dr. Lee noted that she did not have audio or visual hallucinations or paranoid ideation.  (Id.)

Dr. Lee diagnosed PTSD; "MDD," or major depressive disorder, "severe, recurrent with psychotic features"; and "history of abuse/trauma."  (AR 242.)  He prescribed Lexapro[4] and Ativan.[5]

---

[4] Lexapro is name-brand escitalopram oxalate, which is used to treat depression and anxiety.  See Lexapro, WebMD, https://www.webmd.com/drugs/2/drug-63990/lexapro-oral/details (last visited Mar. 22, 2021).

[5] Ativan is name-brand lorazepam, a benzodiazepine medication used to treat anxiety.  See Ativan, WebMD, https://
(continued...)

1    Plaintiff reported on March 13, 2015, that she was doing
2  "ok," had "low energy," "fe[lt] tired all the time," and still
3  had "spontaneous onset anxiety." (AR 247.) But she had a "lot
4  less tearfulness" and anxiety in both "frequency and intensity,"
5  rated her anxiety as "much better," had had no nightmares since
6  her last visit, was going to school and not isolating as much,
7  made a few new friends, had no suicidal ideation or urges to cut,
8  and had had no intrusive thoughts about her father since her last
9  appointment. (Id.)

10    Dr. Lee noted that Plaintiff was cooperative and pleasant;
11 had normal rate, volume, and prosody[6] of speech; exhibited no
12 apparent motor abnormalities; and displayed euthymic mood, full
13 affect, goal-directed and linear thought process, and good
14 insight and judgment. (AR 248.) She had no suicidal, homicidal,
15 or paranoid ideation or audio hallucinations. (Id.) She was
16 alert and oriented; her memory was intact to immediate,
17 intermediate, and remote recall. (Id.) Dr. Lee encouraged her
18 to participate in "behavioral activation/yoga" and to return in
19 two months. (AR 249.)

20    On June 26, 2015, Plaintiff reported "feel[ing] better" and
21 less anxious, with no panic attacks or sadness for two to three
22 weeks; she was sleeping well and hiking more, but her appetite

23 _____

24    [5] (...continued)
25 www.webmd.com/drugs/2/drug-6685/ativan-oral/details (last visited
   Mar. 22, 2021).

26    [6] Prosody is the rhythm, stress, and intonation of speech;
27 it provides clues about attitude or affective state. Prosody in
   Speech and Song, Am. Psych. Ass'n, https://www.apa.org/pubs/
28 highlights/peeps/issue-29 (last visited Mar. 22, 2021).

had decreased.  (AR 254.)  She had reduced her Lexapro dosage because it was making her very tired.  (Id.)  Her mental-status examination was unchanged.  (AR 255.)  Dr. Lee decreased her Lexapro dosage and instructed her to follow up by telephone because she would be in Pennsylvania all summer.  (AR 256.)

Plaintiff saw Dr. Lee again on February 26, 2016, after moving out of her grandfather's house in Pennsylvania, and reported that he had been inappropriate with her.  (AR 467.)  But she had been doing "really good" since moving back, her mood had been "stable," she was seeing a therapist weekly, and she had gotten a job at a crafts store.  (AR 467-68.)  She continued to have "occasional flashbacks/nightmares" from her history of abuse and was sleeping too much, but she was no longer having "social avoidance" and denied any suicidal ideation, intent, or plan. (AR 468.)  Dr. Lee noted no "current psychosis."  (Id.)  She was compliant with her medications and "f[elt] possible [side effects] of fatigue[] and low energy."  (Id.)  Her mental-status examination revealed normal findings.  (AR 468-69.)  Dr. Lee noted that her depression, anxiety, and PTSD symptoms were controlled and adjusted her Zoloft[7] dosage.  (AR 469.)

b.  *West LA Medical Center*

On April 12, 2015, Plaintiff's mother took her to the West LA Medical Center emergency department after she found her cutting herself.  (AR 259, 261.)  Plaintiff reported feeling

---

[7] Zoloft treats depression, panic attacks, and social-anxiety disorder.  See Zoloft, WebMD, https://www.webmd.com/drugs/2/drug-35-8095/zoloft-oral/sertraline-oral/details (last visited Mar. 22, 2021).

"increasingly depressed [and] hopeless," having "passing thoughts of suicide," and feeling more depressed "due to a romantic interest rejecting" her.  (AR 261.)  She had "had suicidal thoughts over the weekend" but no clear plan.  (AR 268.)  She cut herself "to make [her]self feel better."  (Id.)  She continued to have "passive suicidal ideation" at the hospital and described her mood as "miserable" but exhibited no "psychotic [symptoms] or mania."  (Id.)  She was placed on a psychiatric hold (AR 259-60, 268) and transferred to Northridge Hospital Medical Center the next day for further treatment of her depression and suicidal ideation (AR 492, 499).

On July 28, 2016, Plaintiff went to the urgent-care clinic, complaining of suicidal ideation.  (AR 814.)  Her memory and judgment were normal; her affect was not blunt, labile, or inappropriate; she was not agitated or apathetic; and she did not exhibit a depressed mood.  (AR 815.)  She was transported to the emergency department for psychiatric consultation and observation.  (AR 814, 816.)

At the emergency department, Plaintiff reported to psychiatrist Daniel Son that she had been "feeling like nothing is real" for one week and had "thoughts of hurting herself."  (AR 829; see AR 833-34.)  She had been missing work because of these feelings and was getting in trouble and experiencing stress.  (AR 829.)  She claimed to have a plan to cut herself with a razor, but she denied any recent attempt.  (Id.)  She was "crying, tearful" on examination.  (AR 831.)  She had recently been experiencing more "out of body" experiences, "fe[lt] crazy," had "increased irritability" with customers, and was having

10

"paranoid thoughts of the government being after her" and customers "hav[ing] a gun and want[ing] to kill her."  (AR 835.) But she denied any current suicidal thoughts, requested to be discharged to pursue outpatient mental-health resources, and asked for a note for time off work.  (Id.)  Dr. Son diagnosed her with "mood disorder, unspecified" and identified the possible type as "borderline personality disorder," "bipolar disorder," "MDD with psychotic" features, or "psychotic disorders."  (AR 837.)  She was observed for several hours, after which Dr. Son discharged her.  (AR 834.)

On September 25, 2016, Plaintiff went to the emergency department complaining of "suicidal thoughts" for one day that had been worsening.  (AR 923.)  She was not nervous or anxious, and examination findings were negative.  (AR 924.)  She was placed on a psychiatric hold (AR 929-30) and transferred to Del Amo Hospital[8] (AR 948).

### c.   *Northridge Hospital Medical Center*

After being transferred from West LA Medical Center to the Northridge Hospital psychiatric unit on April 13, 2015, Plaintiff's Lexapro dosage was increased.  (AR 501.)  During her hospitalization, she remained depressed but repeatedly denied any current suicidal ideation or plan (AR 548, 625, 629, 635, 640-42, 717) and exhibited no audiovisual hallucinations (AR 503).  She participated in group therapy and activities (AR 625) and was discharged on April 16, 2015 (AR 548).

---

[8] No records from Del Amo Hospital appear in the record.

11

1

d.   *Penn State Hershey Medical Center*

2    On August 21, 2015, Plaintiff went to Penn State Hershey
3    Medical Center complaining of anxiety and depression.  (AR 371.)
4    She said she was fearful of men but was pleasant and cooperative,
5    appeared to be at ease, and made good eye contact with the male
6    doctor who examined her.  (AR 373.)  Her psychomotor activity was
7    normal.  (Id.)  Her speech was clear, coherent, and not
8    pressured.  (Id.)  She was conversant and interactive, and her
9    thought process was coherent and goal directed.  (Id.)  She
10   described her mood as anxious, but she denied any current
11   thoughts of suicide and stated that she would not harm herself.
12   (Id.)  Her affect was restricted sometimes, but she also laughed
13   and "appeared bright."  (Id.)  She had violent dreams of killing
14   her father, but she had no actual homicidal thoughts toward
15   anyone.  (Id.)  She had a distrust of men, feared they might harm
16   her, worried that inanimate objects would move toward her, and
17   was afraid to turn around in the shower for "fear of seeing a
18   demon."  (Id.)  But she had no "hallucinations in the [five]
19   senses."  (Id.)  She had intermittent suicidal ideation and
20   thoughts of cutting or hanging herself and running away and
21   "starving herself in the woods."  (Id.)  But she stated that she
22   would not do those things because she was motivated by her
23   relationship with family and could reach out for help.  (AR 373-
24   74.)  Therefore, her risk of suicide was rated low, and she was
25   deemed safe for outpatient care.  (AR 374.)  She was diagnosed
26   with major depressive disorder, anxiety, borderline personality
27   traits, and obsessive-compulsive personality traits.  (AR 373.)
28   She elected to continue partial hospitalization with intensive

12

1  outpatient treatment and was switched from Lexapro to Zoloft.
2  (AR 374.)

3      She reported to psychiatrist Tjiauw Tan on August 24, 2015,
4  that she was having difficulty initiating and maintaining sleep.
5  (AR 367.)  Her grandfather had allegedly made a "few sexually
6  inappropriate comments and some sexual advances towards her," and
7  her step-grandmother was jealous.  (Id.)  She did not feel safe
8  at her grandfather's house and was upset by the constant
9  arguments between her grandfather and step-grandmother.  (Id.)
10  She reported that she had urges to cut herself but stated that
11  she would use "distraction" techniques to avoid acting on the
12  urge, and she had no suicidal or homicidal ideation.  (Id.)  Dr.
13  Tan noted that she was friendly and pleasant during her
14  examination; her speech was coherent, relevant, and normal in
15  rate, tone, and volume.  (AR 368.)  Her psychomotor activity was
16  normal; she was depressed and her affect was dysphoric and
17  anxious, but her thought process was linear, organized, and goal
18  directed.  (Id.)  No "circumstantiality," "tangentiality," or
19  perceptual disturbances were noted.  (Id.)  Her cognitive
20  functioning and memory were grossly intact, and her insight and
21  judgment were fair.  (Id.)  Dr. Tan found that she did not meet
22  the criteria for inpatient hospitalization and continued her in
23  the partial hospitalization program, which included family,
24  individual, and group therapy.  (Id.)

25      On August 27, 2015, Plaintiff described her mood as happy;
26  her affect was euthymic, and her mood was congruent, reactive,
27  and appropriate.  (AR 365.)  She exhibited linear, organized, and
28  goal-directed thought process.  (Id.)  She strongly denied any

13

1  urge to injure herself or any suicidal or homicidal ideation.
2  (Id.)  No perceptual disturbances were noted, and her insight and
3  judgment were fair.  (Id.)

4      Plaintiff reported on September 1, 2015, that the day before
5  she had had thoughts of hurting herself and strong urges to cut
6  herself.  (AR 363.)  She felt her anxiety was getting worse and
7  recently got upset when her grandfather asked her to start
8  working.  (Id.)  A family session was held, and Plaintiff
9  appeared anxious and dysphoric during it; she stated that she did
10  not feel ready to start working.  (AR 363-64.)  But she was
11  pleasant and cooperative during her mental-status examination,
12  and the examination findings were unchanged.  (Id.)

13      On September 2, 2015, Plaintiff reported that she spoke to
14  her grandfather after the family session and was now considering
15  starting to work part time.  (AR 361.)  She was getting along
16  with her grandparents, and her anxiety, depression, and
17  anhedonia[9] were getting better.  (Id.)  She was more positive and
18  looked forward to working, going to college, and accomplishing
19  her long-term life goals.  (Id.)

20      Plaintiff stated on September 8, 2015, that her mood and
21  anxiety symptoms had "significant[ly] improve[d]."  (AR 359.)
22  She continued to take Zoloft with no adverse affects and looked
23  forward to starting work.  (Id.)  She was getting along well with
24  her grandparents, and her grandfather intended to take her to

25

26      [9] Anhedonia is "a psychological condition characterized by
27  inability to experience pleasure in normally pleasurable acts."
    Anhedonia, Merriam-Webster, http://www.merriam-webster.com (last
28  visited Mar. 22, 2021).

Canada for a vacation in October.  (Id.)  She actively completed chores at home and socialized during the weekend.  (Id.)  She agreed to be discharged the next day.  (Id.)

On September 9, 2015, Plaintiff called the on-call resident and reported a strong urge to cut herself but denied any suicidal or homicidal ideation.  (AR 357.)  She had had an argument with her grandfather, who yelled at her and made some "homophobic and racial comments."  (Id.)  She then texted her mother and reported that she would have "done [her]self" if her mom had not called or texted back within 20 minutes.  (Id.)  Her mother called her back and asked her to take a taxi to the partial-hospitalization program.  (Id.)  She was sad and depressed, had vague thoughts of not living, and felt that life was not worth it.  (AR 355.)  She did not want to return to her grandfather's house and did not feel safe; she was taken to the emergency department, from which she was sent to inpatient psychiatric hospitalization.  (AR 357.)

At the emergency department, Plaintiff stated that she spent the night at her grandfather's house after the argument, but she began wandering the streets the next morning after he would not drive her to her outpatient appointment.  (AR 350.)  She found an abandoned farmhouse, where she began formulating a plan to hang herself.  (Id.)  She stated that she "would likely take her own life if released."  (Id.)  An examination revealed good insight, poor judgment, fair impulsivity, depressed mood, and congruent affect.  (AR 347.)  On September 10, 2015, she was transferred to Philhaven Center for inpatient treatment.  (AR 271.)

On October 2, 2015, Plaintiff reported to psychiatrist Gagandeep Dhillon that following her inpatient treatment, her

15

1  mood was "neutral."  (AR 292.)  She was compliant with her
2  medications and had no side effects.  (Id.)  She feared
3  paranormal activity, such as inanimate objects moving, but denied
4  any suicidal or homicidal ideation, delusions, or perceptual
5  disturbances.  (Id.)  She continued to live with her
6  grandparents.  (Id.)

7      Plaintiff reported to psychiatrist Sanjay Yadav on November
8  6, 2015, that she had had "bad lows" in her mood in the last two
9  weeks.  (AR 287.)  She was having a lot of stress from
10 relationship issues with her grandfather's wife.  (Id.)  She had
11 "a lot of suicidal thoughts and urges to cut herself in the last
12 [two to three] weeks," but her mood was "a lot better" when she
13 was away from home, and she denied anhedonia or current suicidal
14 thoughts.  (Id.)  She denied any panic attacks when not at home
15 or side effects from Zoloft.  (Id.)

16     On November 13, 2015, Plaintiff reported to psychiatrist
17 Aditya Joshi that her mood was "okay"; she had normal energy and
18 concentration, no appetite or sleep problems, and no suicidal or
19 homicidal ideation, intent, or plan.  (AR 326.)  She had taken
20 medication for anxiety after her last visit, and she became
21 extremely dizzy.  (Id.)  She had recently cut herself on her leg
22 because she was upset that her grandfather was pushing her to
23 apply for SSI.  (Id.)  She was compliant with medications, had
24 been attending individual therapy, and was going to start
25 dialectical behavioral therapy, or DBT.  (Id.)  She denied any
26 anxiety except around her grandfather's wife and denied any panic
27 attacks.  (Id.)  She was pleasant, calm, and cooperative.  (AR
28

327.)  She had moderate affective dysregulation[10] that was normal
in range, her thought process was goal directed, she was not
delusional and denied any perceptual disturbances, and no
obsessions or compulsions were noted.  (Id.)  Her insight and
judgment were fair, and her impulse control and memory were
intact.  (Id.)  The dosages of her Zoloft and Vistaril[11] were
adjusted, and she was instructed to continue with DBT therapy for
"provisional borderline personality disorder."  (Id.)

     On January 28, 2016, Plaintiff went to the emergency
department, complaining of depression and "[p]assive" suicidal
ideation "without [a] plan."  (AR 329.)  She had enrolled in DBT,
was "kicked out" of the group after having missed an appointment
while in Los Angeles visiting her mother, and was having trouble
getting in to see her psychiatrist.  (Id.)  She had recently told
her mother and the rest of her family that her grandfather had
abused her while she was living with him, and she was now living
with friends in their basement.  (Id.)  She spoke with a social
worker about getting into counseling and reporting her abuse,
felt "ok to go home," and was discharged.  (AR 331.)

_____

     [10] Affective dysregulation is "an excessive reactivity to
negative emotional stimuli with an affective (anger) and a
behavioral component (aggression)."  Affective Dysregulation in
Childhood — Optimizing Prevention and Treatment: Protocol of
Three Randomized Controlled Trials in the ADOPT Study, BMC
Psychiatry, https://bmcpsychiatry.biomedcentral.com/articles/
10.1186/s12888-019-2239-8 (last visited Mar. 22, 2021).

     [11] Vistaril, or hydroxyzine, is used to relieve itching
caused by allergies, control nausea and vomiting caused by
various conditions, and treat anxiety.  Hydroxyzine, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html
(last visited Mar. 22, 2021).

1

2         e.   *Philhaven Center*

3       On September 10, 2015, Plaintiff was transferred to
Philhaven Center for inpatient psychiatric treatment.  (AR 271.)
On examination she was calm and had a depressed mood, congruent
affect, coherent thought processes, good insight, fair judgment,
and no psychotic symptoms.  (AR 272.)  Her Zoloft dosage was
adjusted, and she was assigned to therapeutic groups and
activities and individual therapy.  (Id.)  She participated in a
lengthy family session with her grandfather, at which they
discussed ways they could communicate more effectively and ways
Plaintiff could use grounding skills.  (Id.)  Her grandfather
committed to helping her get back on her feet, by getting her own
apartment or going to college.  (Id.)  She completed home-safety
and relapse-prevention plans and reported that her mood was
improved and she was looking forward to discharge and beginning a
new job.  (Id.)  She was discharged on September 14, 2015, and
was scheduled for outpatient treatment.  (Id.)

      f.   *Giulianna Nguyen*

    On February 26, 2016, Plaintiff saw Dr. Giulianna Nguyen[12]
to establish care and for an annual physical.  (AR 446.)
Plaintiff reported that she had switched from Lexapro to Zoloft
and that she had experienced chronic fatigue and anhedonia since
the onset of depression.  (Id.)  But her depression was
"improved," and she described her anxiety as "only situational."

        [12] Dr. Nguyen primarily practices internal medicine.  See
Cal. Dep't Consumer Aff. License Search, https://
search.dca.ca.gov (search for "Giulianna" with "Nguyen" under
"License Type," "Physicians and Surgeons") (last visited Mar. 22,
2021).

1  (Id.)

2                    g.  *Thaworn Rathana-Nakintara*

3      Consulting psychiatrist Thaworn Rathana-Nakintara performed

4  a complete psychiatric evaluation of Plaintiff on May 18, 2016.

5  (AR 484-89.)  She told Dr. Rathana-Nakintara that she "had a lot

6  of trauma . . . growing up" and that her "father beat up" her and

7  her mother.  (AR 484.)  She reported having anxiety that made her

8  ill at times, panic attacks, "major depression," "bipolar

9  disorder," paranoia while at school, irrational thinking, and "an

10  urge to hurt [her]self."  (Id.)  Her father was banned from

11  seeing her when she was 11 years old.  (AR 484-85.)  When she

12  graduated high school, she stayed with her grandfather in

13  Pennsylvania, but she said he abused her sexually.  (AR 485.)

14  She felt "much better now by taking Zoloft."  (Id.)

15      Dr. Rathana-Nakintara diagnosed her with mood disorder and

16  cannabis abuse and assigned a GAF score of 95.[13]  (AR 487.)  She

17

18      [13] GAF scores assess a person's overall psychological
functioning on a scale of 1 to 100.  See Diagnostic and
19  Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000).
A GAF score between 91 and 100 indicates "[s]uperior functioning
20  in a wide range of activities," such that "life's problems never
seem to get out of hand"; a person with that score "is sought out
21  by others because of his or her many positive qualities" and
suffers "[n]o symptoms."  DSM-IV 34.  The Commissioner has
22  declined to endorse GAF scores, Revised Medical Criteria for
Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.
23  Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404)
(GAF score "does not have a direct correlation to the severity
24  requirements in our mental disorders listings"), and the most
recent edition of the DSM "dropped" the GAF scale, citing its
25  lack of conceptual clarity and questionable psychological
measurements in practice, DSM-V 16 (5th ed. 2013).  Because GAF
26  scores continue to be included in claimant medical records,
however, the Social Security Administration has clarified that
27
28                                                        (continued...)

                              19

1 was cooperative, maintained good eye contact, had normal
2 psychomotor activity, and demonstrated fluent speech, with normal
3 prosody, rate, and rhythm; her affect was appropriate and
4 reactive, and her mood was responsive and "not depressed or
5 anxious." (AR 486.) Her thought processes were linear and goal-
6 oriented, and she exhibited normal memory, concentration,
7 abstract thinking, insight, and judgment. (AR 486-87.) She
8 denied current suicidal or homicidal ideation, plans, or intent.
9 (AR 486.) Further, she exhibited "no difficulty interacting with
10 the clinic staff" or Dr. Rathana-Nakintara; "maintaining
11 composure," "even temperament," and "social functioning"; or
12 "focusing and maintaining attention." (AR 488.) She had "no
13 difficulties in concentration, persistence and pace." (Id.) Her
14 "level of personal independence [was] adequate," and she was
15 "intellectually and psychologically capable of performing
16 activities of daily living." (Id.)

17     Dr. Rathana-Nakintara opined that she "would have no
18 limitations performing simple and repetitive tasks and no
19 limitations performing detailed and complex tasks." (Id.) She
20 "would have no difficulties . . . perform[ing] work activities on
21 a consistent basis without special or additional supervision";
22 "no limitations completing a normal workday or workweek due to
23 [her] mental condition" or "accepting instructions from
24 supervisor[s] and interacting with coworkers and with the

25

26

27     [13] (...continued)
they are "medical opinion evidence . . . if they come from an
acceptable medical source." Wellington v. Berryhill, 878 F.3d
28 867, 871 n.1 (9th Cir. 2017) (citation omitted).

public"; and "no difficulties . . . handl[ing] the usual
stresses, changes and demands of gainful employment."  (Id.)

h.  *Celine Payne-Gair*

On July 4, 2016, Celine Payne-Gair, a state-agency reviewing
psychologist,[14] evaluated portions of Plaintiff's medical
records, including Dr. Rathana-Nakintara's examination report and
some of the treatment records from Philhaven and Penn State
Hershey Hospital.  (AR 64-65.)

Dr. Payne-Gair opined that Plaintiff had no limitations in
understanding and memory.  (AR 68.)  She was not significantly
limited in the ability to carry out very short and simple or
detailed instructions, perform activities within a schedule,
maintain regular attendance, be punctual within customary
tolerances, sustain an ordinary routine without special
supervision, work in coordination with or in proximity to others
without being distracted by them, make simple work-related
decisions, ask simple questions or request assistance, accept
instructions and respond appropriately to criticism from
supervisors, get along with coworkers or peers without
distracting them or exhibiting behavioral extremes, maintain
socially appropriate behaviors and adhere to basic standards of
neatness and cleanliness, be aware of normal hazards and take
appropriate precautions, travel in unfamiliar places or use
public transportation, or set realistic goals or make plans

---

[14] Dr. Payne-Gair used a medical specialty code of 38 (AR
73), indicating psychology, see Soc. Sec. Admin., Program
Operations Manual System (POMS) DI 24501.004, https://
secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (May 5, 2015).

1    independently of others.  (AR 68-69.)

2        She was moderately limited in the ability to maintain
3    attention and concentration for extended periods, complete a
4    normal workday and workweek without interruptions from
5    psychologically based symptoms, perform at a consistent pace
6    without an unreasonable number and length of rest periods,
7    interact appropriately with the general public, and respond
8    appropriately to changes in the work setting.  (<u>Id.</u>)

9        She could complete simple and detailed tasks, maintain
10   attention and concentration for periods of at least two hours,
11   complete a normal workday and workweek without significant
12   psychologically related interruptions, perform at a consistent
13   pace, and adapt to routine changes in the workplace.  (AR 69.)

14                   i.   *Aurora Charter Oak Hospital*

15       On September 27, 2017, Plaintiff was brought to Aurora
16   Charter Oak Hospital by the Los Angeles Police Department
17   following a verbal altercation with her roommate; she complained
18   of "feeling suicidal" and was placed on a psychiatric hold.  (AR
19   735.)  She exhibited depressed mood; flat affect; and poor
20   insight, social judgment, and coping skills.  (<u>Id.</u>)  She was
21   using illicit drugs like marijuana "off and on," and her urine
22   toxicology was positive for THC.  (<u>Id.</u>)  But she denied
23   hallucinations or delusions.  (<u>Id.</u>)  She was admitted for
24   inpatient treatment; was prescribed medication for depression;
25   and participated in group, individual, milieu,[15] and family

26   _____

27          [15] Milieu therapy treats mental-health conditions by "using
     a person's surroundings to encourage healthier ways of thinking
28                                              (continued...)

                                   22

therapy.  (AR 735-36.)  On October 3, 2017, she was less
dysphoric, her insight and social judgment had improved, and she
was discharged.  (AR 736.)

       2.  <u>Applicable law</u>

    Three types of physicians may offer opinions in Social
Security cases: those who directly treated the plaintiff, those
who examined but did not treat the plaintiff, and those who did
neither.  <u>See</u> <u>Lester</u>, 81 F.3d at 830.  A treating physician's
opinion is generally entitled to more weight than an examining
physician's, and an examining physician's opinion is generally
entitled to more weight than a nonexamining physician's.  <u>Id.</u>;
<u>see</u> § 416.927(c)(1)-(2).[16]  But "the findings of a nontreating,
nonexamining physician can amount to substantial evidence, so
long as other evidence in the record supports those findings."
<u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam)
(as amended).

    The ALJ may discount a physician's opinion regardless of
whether it is contradicted.  <u>Magallanes v. Bowen</u>, 881 F.2d 747,
751 (9th Cir. 1989); <u>see also</u> <u>Carmickle v. Comm'r, Soc. Sec.
Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008).  When a doctor's
opinion is not contradicted by other medical-opinion evidence,

[15] (...continued)
and behaving."  <u>What is Milieu Therapy?</u>, Healthline, https://
www.healthline.com/health/mental-health/milieu-therapy (last
visited Mar. 22, 2021).

[16] For claims filed on or after March 27, 2017, the rules in
§ 416.920c (not § 416.927) apply.  <u>See</u> § 416.920c (evaluating
opinion evidence for claims filed on or after Mar. 27, 2017).
Plaintiff's claims were filed before March 27, 2017, however, and
the Court therefore analyzes them under former § 416.927.

however, it may be rejected only for a "clear and convincing"

reason.  <u>Magallanes</u>, 881 F.2d at 751 (citations omitted);

<u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31).

When it is contradicted, the ALJ need provide only a "specific

and legitimate" reason for discounting it.  <u>Carmickle</u>, 533 F.3d

at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31).  The weight given a

doctor's opinion, moreover, depends on whether it is consistent

with the record and accompanied by adequate explanation, among

other things.  <u>See</u> § 416.927(c); <u>see also</u> <u>Orn v. Astrue</u>, 495 F.3d

625, 631 (9th Cir. 2007) (factors in assessing physician's

opinion include length of treatment relationship, frequency of

examination, and nature and extent of treatment relationship).

>              3.   <u>The ALJ's assessment of the doctors' opinions</u>

The ALJ found Dr. Rathana-Nakintara's opinion assessing no

limitations "somewhat persuasive because [he] had the opportunity

to examine [Plaintiff] personally."  (AR 22.)  He found the

opinion of psychologist Payne-Gair, who assessed some moderate

limitations, more persuasive, however, "in light of the totality

of the objective medical evidence and [Plaintiff's] testimony."

(<u>Id.</u>)

> The ALJ found Dr. Payne-Gair's opinion persuasive
> because it [was] supported by the objective medical
> evidence, which shows a history of complaints of anxious
> depressive, and psychotic symptoms, as well as a
> depressed and anxious mood and some problems with
> insight, judgment, and impulse control, but otherwise
> mostly normal cognitive, expressive, receptive, and
> social functioning and improvement in [Plaintiff's]

condition with treatment.    Dr. Payne-Gair had the
opportunity to review and consider [Plaintiff's] medical
records, which lends her opinion additional support.
(AR 21.)

In light of Plaintiff's testimony regarding the effects of
her symptoms on her ability to interact with others, however, the
ALJ limited her to work that requires no more than incidental
contact with supervisors, no more than occasional and superficial
contact with coworkers, and no contact with the public.  (AR 21-
22.)

Although the ALJ stated that he had "considered statements
from treating . . . physicians" (AR 21), he did not discuss them
by name or assign any particular weight to them.  He did,
however, fully summarize the medical evidence of record.  (See AR
19-22.)

### 4.  Analysis

Plaintiff argues that the ALJ failed to properly consider
the medical evidence of record and erred in affording "greater
weight" to the opinions of Drs. Rathana-Nakintara and Payne-Gair.
(J. Stip. at 3-4, 16.)

#### a.  *Physician opinions*

Plaintiff fails to cite any physician opinion, treating or
nontreating, that contradicted those of Drs. Rathana-Nakintara
and Payne-Gair.  Indeed, no such opinions appear in the record.
No physician assigned Plaintiff any work-related limitations,
much less any greater than those opined by Drs. Rathana-Nakintara
and Payne-Gair.  Thus, contrary to Plaintiff's contention (J.
Stip. at 6), the ALJ did not simply "ignore" medical opinions

25

1  that did not support his conclusions.  See Ford v. Saul, 950 F.3d

2  1141, 1156 (9th Cir. 2020) (ALJ reasonably concluded that

3  doctor's statements that did not discuss degree of plaintiff's

4  limitations were not useful for determining RFC).

5      As the ALJ noted, Dr. Payne-Gair had the opportunity to

6  review and consider many of Plaintiff's medical records,

7  including the opinion of Dr. Rathana-Nakintara.  Further, the ALJ

8  gave Plaintiff the benefit of the doubt by assigning additional

9  limitations based on her testimony regarding the effects of her

10 symptoms on her ability to interact with others.

11     And although Dr. Payne-Gair's July 2016 assessment was

12 somewhat early in the claims process and did not consider later

13 emergency-room treatment and hospitalization, Plaintiff's mental

14 conditions responded similarly during that later treatment and

15 did not significantly deteriorate: she was admitted to Aurora

16 Charter Oak Hospital on September 27, 2017, "feeling suicidal"

17 following a verbal altercation with her roommate.  (AR 735.)  She

18 was prescribed medication for depression and participated in

19 group, individual, milieu, and family therapy.  (AR 735-36.)  A

20 few days later, on October 3, she was less dysphoric, her insight

21 and social judgment had improved, and she was discharged.  (AR

22 736.)  As Plaintiff acknowledges, her symptoms "waxed and waned"

23 somewhat throughout the relevant period (J. Stip. at 4) but

24 overall remained relatively stable.  See Miller v. Berryhill, 732

25 F. App'x 526, 528-29 (9th Cir. 2018) (no error in declining to

26 remand case to ALJ to consider later surgical procedure because

27 there was no evidence of significant change in functional

28 limitations).

1     Plaintiff cites various treatment notes in which a physician
2    observed that she had trouble holding jobs, was often absent from
3    them, and left jobs because she could not handle criticism at
4    work and the stress made her want to cut herself.  (See J. Stip.
5    at 15-16 (citing AR 320, 735, 829).)  But the treatment notes
6    were not physician opinions regarding Plaintiff's work
7    limitations.  Rather, they were nothing more than the recording
8    of Plaintiff's own subjective complaints and opinions about her
9    limitations.  (AR 320, 735, 829); see Thomas v. Barnhart, 278
10   F.3d 947, 960 (9th Cir. 2002) (finding that ALJ properly rejected
11   Plaintiff's symptom statements when only evidence of symptoms was
12   her statements to doctor and her testimony at hearing).
13   Moreover, almost all her jobs involved heavy customer interaction
14   (see AR 34-35, 320, 735, 829, 835), which even Plaintiff
15   acknowledged was the main trigger for her symptoms (AR 36).  By
16   limiting her to no contact with the public, the ALJ fully
17   accommodated that limitation.  See Barney v. Berryhill, 769 F.
18   App'x 465, 466 (9th Cir. 2019) ("The ALJ's RFC determination
19   limiting [plaintiff] to simple unskilled work with no public
20   contact reasonably accommodated any limitations . . . as to
21   cognitive and social interaction impairments.").  Finally, as
22   discussed in section V.A.4.b. below, the medical evidence did not
23   support any work limitations beyond those assigned by the ALJ.

24              b.  *Medical evidence*

25       Plaintiff contends that the ALJ's assessment of the medical
26   evidence "failed to adequately address treating physician records
27   and opinions which indicate greater functional limitations than
28   those found by the ALJ."  (J. Stip. at 3-4.)  But the ALJ

27

considered all of the record medical evidence, and as noted,
assigned limitations greater than those in any medical opinion.
The ALJ's analysis of the medical evidence detailed the
occasional deterioration of Plaintiff's condition, including
psychiatric hospitalizations in April 2015, July and September
2016, and September 2017.  (AR 19-20.)  The medical record as a
whole demonstrated few work limitations, however, as the ALJ
explained.

He also correctly noted that although Plaintiff's treatment
providers noted her anxious and depressed mood and her sometimes
restricted affect, they also routinely observed a cooperative and
pleasant attitude, full orientation, clear and coherent speech,
normal psychomotor activity, linear and goal-directed thought
process, intact memory, and fair insight and judgment.  (AR 20
(citing AR 276, 283, 309, 311-12, 314, 321, 334, 405, 411, 434,
469, 837).)

Her relative functional stability was likely because, as the
ALJ noted (AR 21), Plaintiff's course of treatment was largely
successful.  She was prescribed psychotropic medications such as
Lexapro, Ativan, and Zoloft.  She also participated in
individual, group, and family therapy.  Her argument that her
mental conditions were not controlled with her medication (J.
Stip. at 4) is not well taken.  Instead, the record demonstrates
that her symptoms were generally controlled when she took her
medication as prescribed.  In March 2015, just one month after
Dr. Lee prescribed her psychotropic medication, she had a "lot
less tearfulness" and anxiety in both "frequency and intensity,"
rated her anxiety as "much better," had had no nightmares since

her last visit, was going to school and not isolating as much, made a few new friends, had no suicidal ideation or urges to cut, and had had no intrusive thoughts about her father since her last appointment.  (AR 247.)  In June 2015, she reported "feel[ing] better" and less anxious, with no panic attacks and no sadness for two to three weeks; she was sleeping well and hiking more. (AR 254.)  In February 2016, she reported that she had switched from Lexapro to Zoloft, her depression was "improved," and her anxiety was "only situational."  (AR 446.)  Later that month, she told Dr. Lee that she no longer experienced "social avoidance." (AR 468.)  In May 2016, she told Dr. Rathana-Nakintara that she felt "much better now by taking Zoloft" (AR 484), and Dr. Rathana-Nakinara noted that she was "adhering and responding well to treatment" (AR 488).

On the other hand, Plaintiff experienced setbacks when she was not compliant with her medication.  When she was hospitalized following an altercation with her roommate in September 2017, she reported that she had not taken her medication for one week.  (AR 737.)  Once she became compliant, her symptoms quickly improved. (AR 742-46.)

Plaintiff correctly notes that a few instances of improvement of symptoms is not a proper basis for concluding that she is capable of working.  See Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.");

1  Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001) (noting
2  that doctor's statements of improvement must be read in context
3  of overall diagnostic picture).  The isolated instances here are
4  of deterioration, however, not improvement.  As the ALJ
5  documented, Plaintiff's four brief hospitalizations of a few days
6  each were separated by months and sometimes more than a year of
7  medication compliance, improved symptoms, and relatively normal
8  functioning.  (See AR 19-22 (citing 247, 254, 276, 283, 309, 311-
9  12, 314, 321, 334, 405, 411, 434, 446, 468-69, 488, 742-46,
10  837).)  At most, the records cited by Plaintiff establish that
11  the medical evidence was susceptible of more than one rational
12  interpretation, which is insufficient to warrant reversal.  See
13  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012); Tommasetti
14  v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ is "final
15  arbiter with respect to resolving ambiguities in the medical
16  evidence").  Remand is not warranted.

17       B.   The ALJ Properly Assessed Plaintiff's Symptom
18            Statements

19            1.   Applicable law

20       An ALJ's assessment of a claimant's allegations concerning
21  the severity of her symptoms is entitled to "great weight."
22  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended)
23  (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir.
24  1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to
25  believe every allegation of disabling pain, or else disability
26  benefits would be available for the asking, a result plainly
27  contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina, 674 F.3d at 1112
28  (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

1     In evaluating a claimant's subjective symptom testimony, the
2  ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d
3  at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16,
4  2016).  "First, the ALJ must determine whether the claimant has
5  presented objective medical evidence of an underlying impairment
6  '[that] could reasonably be expected to produce the pain or other
7  symptoms alleged.'"  Lingenfelter, 504 F.3d at 1036 (citation
8  omitted).  If such objective medical evidence exists, the ALJ may
9  not reject a claimant's testimony "simply because there is no
10 showing that the impairment can reasonably produce the degree of
11 symptom alleged."  Id. (citation omitted; emphasis in original).
12     If the claimant meets the first test, the ALJ may discount
13 the claimant's subjective symptom testimony only if she makes
14 specific findings that support the conclusion.  See Berry v.
15 Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or
16 affirmative evidence of malingering, the ALJ must provide a
17 "clear and convincing" reason for rejecting the claimant's
18 testimony.  Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir.
19 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036);
20 Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th
21 Cir. 2014).  The ALJ may consider, among other factors, the
22 claimant's (1) reputation for truthfulness, prior inconsistent
23 statements, and other testimony that appears less than candid;
24 (2) unexplained or inadequately explained failure to seek
25 treatment or to follow a prescribed course of treatment; (3)
26 daily activities; (4) work record; and (5) physicians' and third
27 parties' statements.  Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d
28 996, 1006 (9th Cir. 2015) (as amended); Thomas, 278 F.3d at 958-

59 (citation omitted).  If the ALJ's evaluation of a plaintiff's alleged symptoms is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

>              2.   Plaintiff's symptom statements and testimony

In a January 25, 2015 Function Report, Plaintiff stated that she frequently experienced "random, severe panic attacks in public [and] social situations," "PTSD flashbacks" stemming from abuse by her father, "major fear being around men," anxiety that made her feel "physically ill," "run away" thoughts, irrational "self-injurious thinking," "p[s]ychosis episodes," emotional instability, lack of trust of others, and hypervigilance.  (AR 177.)  In an undated Disability Report, she stated that her ability to work was limited by "major depression," "chronic PTSD," "borderline personality disorder," and "generalized anxiety."  (AR 189.)

At the April 17, 2018 hearing, Plaintiff testified that she last worked about a week before the hearing.  (AR 34.)  She worked between 15 and 20 hours a week as a sales associate and cashier at a pet store.  (Id.)  She testified that she was precluded from working full time by her "anxiety and panic attacks that she [had] during work[]."  (AR 35-36.)  She had gotten "very physically hot and sweaty and nauseous" when "assist[ing] customers" at the pet store, "triggered with interactions," "especially [with] male individuals."  (AR 36.)  She had had "flashbacks at work that cause[d] her to . . . abandon [her] tasks."  (Id.)  Depression and "suicidal ideation" also limited her ability to work.  (AR 38-39.)  She had "often

cut [her]self," behavior that was "still going on" at the time of
the hearing.  (AR 39.)  She last cut herself five days before the
hearing.  (AR 47-48.)  She left the home where she was staying
with the intention of committing suicide but returned and cut
herself because she had missed her shift at the pet store.  (AR
48.)  She had missed three days since she started working at the
pet store five weeks earlier.  (Id.)  The family with whom she
was staying had asked her to leave.  (Id.)

     She "d[id] not smoke marijuana" but had used cannabis in the
past to help her sleep.  (AR 40.)  She had experienced headaches
when she was taking Lexapro and Lorazepam for anxiety, but she
was no longer taking them.  (AR 43.)  At the time of the hearing,
she was attending therapy once a week.  (AR 43-44.)  She usually
walked to get around, but she took the bus on longer trips.  (AR
44.)  She did not drive and did not have a license.  (Id.)  She
had been fired or agreed to leave jobs several times because of
poor attendance.  (AR 46-47.)  It usually took her "a couple of
days to complete" a "task . . . such as laundry," she did not
cook for herself, and she got "overwhelmed with . . . self-
hygiene."  (AR 49.)

          3.  The ALJ's decision

     The ALJ reviewed Plaintiff's claimed limitations and found
that her "medically determinable impairments could reasonably be
expected to cause the alleged symptoms; however, [her] statements
concerning the intensity, persistence, and limiting effects of
these symptoms [were] not entirely consistent with the medical
evidence and other evidence in the record[.]"  (AR 19.)  The ALJ
discounted Plaintiff's subjective symptom statements because they

33

1  were inconsistent with the objective medical evidence (AR 20) and

2  her work history (AR 21) and because they were controlled when

3  she was compliant with medication and treatment (id.).

4          4.  Analysis

5      Plaintiff asserts that the ALJ failed to properly assess her

6  subjective symptom statements.  (J. Stip. at 24-31, 35-37.)  For

7  the reasons discussed below, the ALJ did not err.

8                  a.  *Medical and other evidence*

9      To start, the ALJ properly concluded that Plaintiff's

10  subjective symptom statements were inconsistent with the

11  objective medical evidence in the record.  Morgan v. Comm'r of

12  Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (finding

13  "conflict" with "objective medical evidence in the record" to be

14  "specific and substantial reason" undermining plaintiff's

15  allegations).  Among other things, the ALJ noted that although

16  Plaintiff claimed she could not work because of major depression,

17  chronic PTSD, borderline personality disorder, and anxiety (see

18  AR 19 (citing AR 189)), she was often noted to be cooperative and

19  pleasant, with full orientation, clear and coherent speech,

20  normal psychomotor activity, linear and goal-directed thought

21  processes, intact memory, and fair insight and judgment (AR 20

22  (citing AR 276, 283, 309, 311-12, 314, 321, 334, 405, 411, 434,

23  469, 837)).  The ALJ also correctly noted that although she told

24  Dr. Rathana-Nakintara that she felt "emotionally unstable," Dr.

25  Rathana-Nakintara observed a cooperative attitude; good eye

26  contact; normal psychomotor activity; fluent speech; appropriate

27  and reactive affect; a responsive mood; linear and goal-directed

28  thought processes; intact memory, concentration, and abstract

1  thinking; commonsense understanding; and no abnormal thought

2  content or perceptions.  (AR 20 (citing AR 484-87).)  No doctor

3  assessed functional limitations greater than the RFC.  As noted

4  previously, the records cited by Plaintiff at most establish that

5  the medical evidence was susceptible of more than one rational

6  interpretation, which is insufficient to warrant reversal.  See

7  Molina, 674 F.3d at 1111; Tommasetti, 533 F.3d at 1041.

8                   *b.  Effective treatment*

9       The ALJ also discounted Plaintiff's subjective symptom

10  statements because they were inconsistent with evidence

11  demonstrating that her symptoms improved and were relatively

12  controlled when she complied with her prescribed treatment and

13  medication.  (AR 21; see AR 247 (Plaintiff reporting one month

14  after Dr. Lee prescribed psychotropic medication that she had

15  "lot less tearfulness" and anxiety in both "frequency and

16  intensity"; her anxiety was "much better"; she had no nightmares

17  since last visit; she was going to school, not isolating as much,

18  and had made new friends; and she had no suicidal ideation, urges

19  to cut, or intrusive thoughts about her father since her last

20  appointment), 254 (Plaintiff reporting "feel[ing] better" and

21  less anxious, with no panic attacks or sadness for two to three

22  weeks, sleeping well, and hiking more), 446 (Plaintiff stating

23  that she had switched from Lexapro to Zoloft, her depression was

24  "improved," and her anxiety was "only situational"), 468

25  (Plaintiff telling Dr. Lee that she no longer experienced "social

26  avoidance"), 484 (Plaintiff reporting that she felt "much better

27  now by taking Zoloft"), 488 (Dr. Rathana-Nakinara noting that

28  Plaintiff was "adhering and responding well to treatment").)

1    Plaintiff argues that her hospitalizations demonstrate that
2  her treatment was not effective.  But that she occasionally
3  needed more aggressive treatment, especially when she had not
4  been compliant with her medication, does not diminish the
5  numerous times when she acknowledged that her treatment and
6  medication was working.  This is at most another record gray
7  area, the final arbiter of which was the ALJ.  See Molina, 674
8  F.3d at 1111; Tommasetti, 533 F.3d at 1041.  The ALJ properly
9  considered the evidence that Plaintiff's treatment was effective
10 in discounting her symptom statements.

11                  *c.  Plaintiff's employment*

12    Finally, the ALJ properly discounted Plaintiff's subjective
13 symptom statements because her "earnings records and testimony
14 showed [she] worked several part-time jobs between 2016 and 2017"
15 and because she stated in her disability report that she was
16 "'currently working' when she filed the application" (AR 21
17 (citing AR 189)).  See Presley-Carrillo v. Berryhill, 692 F.
18 App'x 941, 945 (9th Cir. 2017) (ALJ reasonably discounted
19 Plaintiff's testimony based on daily activities, "particularly
20 given that she already worked part-time"); Hollen v. Comm'r of
21 Soc. Sec., No. 3:15-cv-2357-GPC-DHB, 2017 WL 1075194, at *13
22 (C.D. Cal. Mar. 22, 2017) ("Plaintiff's certification to the
23 unemployment office that she was ready, willing, and able to
24 work, combined with the finding she worked part-time in 2014,
25 provides further clear and convincing reasons for the ALJ to
26 discount her testimony.").

27    Plaintiff contends that she had attendance issues with those
28 jobs and was unable to sustain even part-time employment for more

than brief periods.  (J. Stip. at 30-31.)  But assuming
Plaintiff's apparent history of attendance issues at those
customer-service jobs was probative of her ability to sustain
employment in them, the ALJ did not find that she could perform
those jobs on a full-time basis.  The ALJ limited her to "no more
than simple, routine, repetitive tasks; no more than incidental
contact with supervisors; no more than occasional and superficial
contact with coworkers; and no contact with the public."  (AR
18.)  Moreover, "[e]ven where [a plaintiff's] activities suggest
some difficulty functioning, they may be grounds for discrediting
[her] testimony to the extent that they contradict claims of a
totally debilitating impairment," Molina, 674 F.3d at 1113
(citations omitted), or "suggest" that her "claims about the
severity of [her] limitations were exaggerated," Valentine v.
Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009).
Plaintiff's work activity demonstrated that she was functional.
She was able to go to work, at least on a part-time basis, and
deal to some degree with supervisors and the public.  Without the
additional stress that contact entailed, she likely would be able
to do even more; therefore, the ALJ's RFC reasonably accommodated
this limitation.  See Barney, 769 F. App'x at 466.  The ALJ
properly considered this evidence in assessing Plaintiff's
symptom statements.

Substantial evidence supported the ALJ's discounting of
Plaintiff's subjective symptom statements.  Remand is not
warranted on this basis.

C.    The RFC Is Supported by Substantial Evidence
Plaintiff claims that the RFC is not supported by

37

substantial evidence in that it failed to include a limitation
for her attendance issues.  (J. Stip. at 37-39, 40-41.)  Although
she points to her own statements in medical records that she had
a poor work-attendance record, she offers no evidence that any
doctor assigned any such limitation.  To the extent she did have
attendance issues, nothing indicates she would still have them in
the jobs the ALJ identified, which involved very limited
interaction with other people, her main trigger.  Moreover, as
discussed in sections V.A. and V.B., the ALJ considered the
medical evidence and opinions and properly discounted Plaintiff's
subjective symptom statements.  Based on the record and
Plaintiff's failure to identify any flaw in the ALJ's reasoning,
he properly omitted any such limitation from the RFC.  <u>See</u>
<u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ not
required to include in RFC limitations based on plaintiff's
properly discounted subjective complaints); <u>Figueroa v. Colvin</u>,
No. CV 12-06742-OP., 2013 WL 1859073, at *9 (C.D. Cal. May 2,
2013) (no error in failing to include limitations in RFC when ALJ
properly rejected plaintiff's subjective complaints of
impairment).  This issue does not warrant remand.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42
U.S.C. § 405(g),[17] IT IS ORDERED that judgment be entered

---

[17] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."

AFFIRMING the Commissioner's decision, DENYING Plaintiff's
request for remand, and DISMISSING this action with prejudice.

DATED:  March 23, 2021

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge